MANUEL MONCLOVA, ETC., Plaintiff and Appellant, *v.* FINAN-
CIAL CREDIT CORPORATION, Defendant and Appellee.

No. 12213. Decided November 8, 1961.

*Salvador Suau* and *Rafael Martínez Alvarez, Jr.,* for appellant. *Juan Enrique Géigel, Guillermo Silva, Jaime A. García,* and *Hernán G. Pesquera* for appellee. *Beverley, Castro & López Baralt, Iván Reichard* and *Maurice Ravage,* as amici curiae.

MR. JUSTICE BLANCO LUGO delivered de opinion of the Court.

As trustee of the bankrupt corporation Soler & Mascaró Auto Corporation, Manuel Monclova began a civil action before the Superior Court, San Juan Part, against Financial Credit Corporation, in which, in synthesis, he exercised six claims which can be broken down in the following fashion:

(a) It maintains that a contract denominated "dealer's retail agreement" was simulated, drafted and executed in order to cover up loan operations at usurious interest, and that, because of this, Soler & Mascaró Auto Corporation paid to the defendant, and the defendant should return to it, the sum of $150,000;

(b) That in accordance with the terms of said agreement the defendant improperly retained monies belonging to the bankrupt corporation and utilized them for its own benefit, and that the profit thus obtained, as well as those benefits which said profits in turn produced, totalled $251,200, which the defendant must also return to the plaintiff;

(c) That in repossessing and selling motor vehicles subject to conditional sales contracts which Financial Credit Corporation acquired from Soler & Mascaró Auto Corporation, said defendant incurred extraordinary and unnecessary expenses amounting to $80,000, which were improperly charged to the account of the bankrupt corporation and which must be returned to the plaintiff;

(d) That due to default of the corresponding premiums, the insurance company cancelled certain policies which covered automobiles sold on conditional sales and which were in the hands of the conditional purchasers; that the total of said premiums was $5,217.74, which had been charged by Soler & Mascaró Auto Corporation to the purchasers, and was returned to them by Financial Credit Corporation, which in turn charged them to the bankrupt corporation, a practice which is allegedly improper, and by virtue of which the return of the aforesaid sum of $5,217.74 is claimed;

(e) That for the exclusive benefit of the defendant, the latter required Soler & Mascaró Auto Corporation to utilize the services of Juan Enrique Géigel, Esquire, and that for this reason the plaintiff paid $600, which the defendant must return to the plaintiff;

(f) That as a consequence of the acts alleged under paragraphs (a) and (b), the defendant caused the bankruptcy of Soler & Mascaró Auto Corporation and thus caused damages valued at the sum of $1,600,000.

The defendant answered the complaint and alleged certain special defenses. After the corresponding trial had been held, a trial which lasted several days and during which abundant oral and documentary evidence was presented (the transcript of evidence which is before this Court consists of eight separate parts, with a total of 2,651 pages), the trial court entered judgment dismissing the claims set out under (a), (b), (e) and (f), and it dismissed those claims set out under paragraphs (c) and (d), without adjudicating the latter

definitively and without prejudice of their being reproduced within the bankruptcy proceedings. For a better determination of this appeal we have attached to this opinion as Appendix "A" a transcript of the findings of fact of the respondent judge. It would be difficult to do a better job of careful analysis of the evidence which is apparent in the trial court's findings. On the other hand, the complete picture of the factual situation which is evident in these findings is very appropriate for the consideration of various questions of law which have been raised. Thus, we will refer to these findings during the course of this discussion.

Twelve errors are raised in the appeal taken by the plaintiff. From the assignment of errors it is clear that the claims set out under paragraphs (e) and (f), that is, those claims relating to the payment of services rendered by counsel Juan E. Géigel, and the damages caused by the defendant upon accelerating the bankruptcy of the plaintiff, have not been pursued on appeal.

## I

Following a logical order, we must first discuss whether in the execution of the dealer's retail agreement there was fraud on the part of the defendant Financial Credit Corporation or lack of knowledge of its terms on the part of Soler & Mascaró Auto Corporation, as the appellant points out and superficially discusses in the eighth error.

In order to meet this allegation it is necessary to reiterate that fraud will not be presumed, *Feliciano* v. *P. Cedeño, S. en C.*, 78 P.R.R. 37 (1955); *Byars* v. *Cherokee County*, 118 S.E.2d 324 (S. C. 1961); *Newell* v. *Rountree Olds-Cadillac Co.*, 129 So.2d 599 (La. 1961); *Sutherland* v. *Sutherland*, 358 P.2d 776 (Kan. 1961); and that a conclusion on the existence of fraud may not be based on mere conjectures and suspicions, and must be founded on solid, clear and convincing proof, *Nine* v. *Ortiz*, 67 P.R.R. 883,

895 (1947); *Heirs of Gómez* v. *Colón*, 63 P.R.R. 99 (1944); *Serrano* v. *Torres*, 61 P.R.R. 157, 161 (1942); *The Texas Co. (P. R.) Inc.* v. *Estrada*, 50 P.R.R. 709, 713–14 (1936); *Buzard* v. *Griffin*, 358 P.2d 155 (Ariz. 1961); *Master* v. *Master*, 166 A.2d 251 (Md. 1960). Of course, a determination on the existence of fraud depends to a great degree on the particular facts of each case, and in the present case, the findings of the trial court, the correctness of which is not attacked—and which in passing are amply sustained by the evidence—far from supporting that conclusion, reveal clearly that the directors of the bankrupt corporation were not unduly induced to execute the said contract, that no false representations nor fraudulent promises were made to them, nor was there any exaggeration made of expected profits or hopes for the future.

As a matter of fact, the creation of the defendant corporation was originally conceived by the very directors of the bankrupt corporation as a necessary and indispensable appendix to their principal business as the means through which to obtain credit for their retail sales, a credit which it could not obtain, due to its insufficient capital, from the banking institution which up to then had extended such credit. The defendant served this purpose efficiently. The biggest volume of its business was realized in transactions with Soler & Mascaró Auto Corporation, an entity towards which it extended a line of credit which permitted it to continue the expansion of its business and the carrying out of its business in unsuspected proportion. We will not extend ourselves in setting out in detail the facts which justify the absence of fraud and the supposed lack of knowledge on the part of the bankrupt corporation of the terms of the contract between the parties. We will limit ourselves to refer to the findings of fact made by the trial court under numbers 2 through 12, 14 and 15, 18 and 19, in which findings it is made clear that said imputation is unjustified.

Apparently it is pretended that we derive a conclusion that there was fraud or undue advantage in the execution of the said contract because, in the long run, Soler & Mascaró had to enter into a voluntary bankruptcy proceeding and Financial Credit Corporation has progressed singularly in the financing field. But as the trial court properly found, the failure of Soler & Mascaró Auto Corporation was due to deficient administrative practices, to other factors, and to acts of the very directors of said corporation.

## II

### — A —

#### LEGISLATION

The central issue involved in this appeal is whether any of the provisions of the dealer's retail agreement to which we have been making reference, or the relationships between Financial Credit Corporation and Soler & Mascaró Auto Corporation infringe the provisions of local law as to the fixing of interest in obligations. The precepts of applicable law contained in the Civil Code of Puerto Rico, 1930 edition, are the following:

Section 1649 (31 L.P.R.A. § 4591):

"In the absence of an agreement in writing entered into and executed at the time, the rate of interest upon the loan or forbearance of money or goods or upon any variety of obligation or contract or upon unpaid judgments, shall be at the rate of six (6) dollars annually, on each one hundred (100) dollars or upon its equivalent in value, and at the same rate for a greater or less sum or for a longer or shorter period; *Provided, however*, That no rate of interest shall be fixed by special agreement in excess of nine (9) dollars a year on each one hundred (100) dollars or upon its equivalent in value, when the capital the object of the loan or of the agreement does not exceed three thousand (3,000) dollars, and eight (8) dollars a year on each one hundred (100) dollars when the capital passes said sum. Within the limits here defined, it shall be lawful to discount bills and notes and other similar obligations."

Section 1652 (31 L.P.R.A. § 4594) :

"No person, except as authorized by the preceding section, shall demand or receive, directly or indirectly, any money or goods, at any greater rate of interest for the loan or extension of time of said loan, than the rate provided for herein. Nothing in this chapter shall be taken to prohibit the sale of goods for cash at a less price than for credit.

"No contract wherein or whereby there is reserved, accepted or secured, or agreed to be reserved, accepted or secured, any greater rate of interest than is allowed by this chapter, may be made effective in any court in Puerto Rico, except for the amount of the principal due; and the court must provide, furthermore, in the judgment directing the debtor to pay the principal, that the creditor shall recover only seventy-five per cent of said principal and that the remaining twenty-five per cent shall be awarded to and recovered by the Commonwealth of Puerto Rico, who may obtain a writ of execution, in the same manner as the plaintiff, but without precedence over the amount awarded to the latter, to make effective the twenty-five per cent in that manner awarded."

The provisions on the fixing of interest on all types of obligations were not incorporated in the Civil Code of 1902.[1]

---

[1] In Spain, the Civil Code is silent on this matter, which is regulated by an Act of July 23, 1908 (II Medina y Marañón, *Leyes Civiles de España* 867–873, 1958 ed.) the essential characteristic of which is that a maximum type of interest is not fixed, but it is left to the discretion of the judge to determine the usurious character of the loan contract when the interest is *notably* higher than normal and is manifestly not in proportion with the circumstances of the case. By general rule this normal interest is eight per cent, Judgments of February 13, 1947 (17 *Jur. Civ.* 623, 632) and July 13, 1942, 9 Aranzadi, Repertoire of Jurisprudence 537 (1942). The circumstances to which the law refers are the painful situation of the debtor (*cf. General Motors Acceptance Corp.* v. *Weinrich,* 262 S. W. 425 (Mo. 1924), his inexperience or the limitation of its mental faculties. It has been pointed out that this law attempts "in pursuit of the social, ethical and moral aim underlying it to protect those who assume obligations when they are in need," and that the concurrence of these circumstances produces the nullity because its presence implies "a diminution of freedom" of contract. Judgment of March 15, 1956 (55 *Jur. Civ.* 557, III). See R. Morán, *Application of the Law of Usury to Loans Payable in Instalments,* 29 University of Puerto Rico Law Review 242 (1960).

The same solution as in Spain prevails with respect to interest on loans in Mexico (Articles 2393 through 2397 of the Civil Code), Colombia

They formed part of a special law approved on March 1, 1902. (Rev. Stat. 1902, § § 359–368, pp. 163–166.[2] Before being transplanted to our Civil Code of 1930, this Act was amended on three occasions: 1—through Act of March 12, 1903 (Sess. Laws, p. 108) the maximum type of legal interest was reduced from twelve to six per cent, and a provision was included to the effect that "within the limit here defined, it

---

(Article 2231 of the Civil Code), and Panamá (Article 1450 of the Civil Code).

With the exception of Maine, Massachusetts and New Hampshire, there are laws in most of the states limiting or regulating the type of interest. For a review of legislation for fixing of interest in the different states of the Union, see Horack, *A Survey of the General Usury Laws,* 8 Law and Contemp. Problems 36, 48 through 53 (1941). We must point out that in some states the provisions to which the said article makes reference have undergone notable changes precisely in order to adjust them to the problem of conditional sales and its financing. See Maryland Annotated Code, Article 83, § 132 (1957); New York Personal Property Law, § § 304, 404.

As to the fixing of interest by national banks the applicable law appears in 48 Statutes 191 (1935), 12 U.S.C.A. § 85.

[2] Sections 1 and 4 of this Act, corresponding to § § 1649 and 1652 copied above read as follows:

"Section 1.— (359) —That in the absence of an agreement in writing entered into and executed at the time, the rate of interest upon the loan or forbearance of money or goods or upon any variety of obligation or contract or upon unpaid judgments, shall be at the rate of twelve ($12) dollars annually, on each one hundred ($100) dollars or upon its equivalent in value and at the same rate for a greater or less sum or for a longer or shorter period. *Provided,* however, that no rate of interest shall be fixed by special agreement in excess of twelve ($12) dollars a year on each one hundred ($100) dollars or upon its equivalent of value."

"Section 4.— (362) —No persons shall, except as authorized by section 3 of this Act, demand or receive, directly or indirectly, any money or goods, or by way of commission or discount, or in any other way, any greater rate of interest for the loan or forbearance of any money, than the rate provided herein.

"Any contract whereon or whereby directly or indirectly there is reserved, or accepted, or secured, or agreed to be reserved, accepted or secured any greater rate of interest than is allowed by this Act, is utterly void for all purposes; and a court of competent jurisdiction in a proper action may enjoin either the collection thereof, or any proceeding to enforce such contract, and may direct the original of such contract to be made void and the payment of the principal sum, or interest, or any part thereof shall not be required as a condition to granting the remedies last mentioned."

shall be lawful to discount bills and notes and other similar obligations" (§ 1); 2—the Act of March 14, 1907 (Sess. Laws, p. 229), (a) limited the application of the provisions on maximum interest to loan operations and eliminated the reference which had been made "to a commission or discount," and (b) it limited the nullity of the contract in which there was reserved, accepted or secured an interest rate higher than the maximum permitted by law, in that said nullity would not reach the payment of the principal sum; and 3—through Act No. 47 of April 13, 1916 (Sess. Laws, p. 100) (a) a paragraph was added in which it was set out that "nothing in this Act shall be taken to prohibit the sale of goods for cash at a less price than for credit"; and (b) the Act also set out that in the case of a transaction in violation of the law, the creditor could only obtain from the debtor seventy-five per cent of the principal and that the remaining twenty-five per cent would be adjudged as the penalty to the State.

It is significant that on the same date that the 1916 amendment which makes reference to cash sales at a price lower than credit was approved, the Legislature also enacted legislation on conditional sales, Act No. 61 of April 13, 1916 (Sess. Laws, p. 123, 10 L.P.R.A. §§ 31–41). This legislative act constitutes, at the least, a recognition of the economic reality that there necessarily must and should exist a difference between a price of a cash sale and a conditional sale.[3] Six years ago "before the clamor of a numerous sector of the people of Puerto Rico in connection with the instalment plan purchases through the system of conditional sales

---

[3] Price Regulation No. 5 establishing selling prices for televisions, repair services and antennas promulgated by the Administrator of Economic Stabilization, effective July 1, 1954, which was suspended by an order of August 8, 1958, effective the 11th of the same month (23 R.&R.P.R. 734–451) provided in its § 3(e) that the maximum instalment price was the same one as the price for cash sales, but it recognized that in conditional sales a specific additional amount could be added over the balance owed for "the payment of *interest and collection and financial expenses*," providing further that the amount could not exceed ten per cent of said balance.

and chattel mortgages, by virtue of which excessively high prices were being charged," [4] and for the purpose of remedying the evils which were said to exist, that is, 1—the high profit margins being obtained in these transactions; 2—abusive practices in financing operations, and 3—abuse in the execution of contracts without guaranties to the consumer, the Legislative Assembly approved an amendment to § 2 of the Conditional Sales Act (Act No. 13 of April 12, 1955, Sess. Laws, p. 50, 10 L.P.R.A. § 32), in order "to regulate and maintain control of profit margins simultaneously and through the Economic Stabilization Office" and wipe out said evil by regulating the form of filling out the contracts prohibiting the signature of contracts in blank, and establishing the requisite of *specifying the price of the article*. Identical provisions were approved in connection with chattel mortgages. (Act No. 57 of June 10, 1955, Sess. Laws, p. 206, 30 L.P.R.A. §§ 1873 and 1875.) And, even more recently, through Resolution No. 13 of the House of Representatives of January 24, 1961, a study of the system of conditional sales was authorized. The corresponding report was rendered on May 2. It is pending consideration before the Legislative Bodies in the form of House Bill No. 93, filed by representatives Alvarado, Font Saldaña, Polanco Abréu, and Cordero, through which it is intended to regulate the business of the financing of contracts of conditional sales of chattels. Said Act requires that any person or entity engaged in this business (a) must be licensed by the Secretary of the Treasury (§ 4), (b) must file current discount rates in financing operations (§ 9). Besides, the Secretary of the Treasury is authorized to fix, through regulations approved by the Governor, discount rates for any license carrying on the business of financing of conditional sales; and, to establish the terms and conditions which said contracts must contain.

---

[4] *Diario de Sesiones* at 1844 (1954).

— B —

## THE INTERPRETATION OF THE COURTS

Mankind has been worried over the problem of usury since biblical times. The Pentateuch is filled with references to usury. In Exodus, among the social legislation that Jehovah gave to Moses, it is pointed out that "If you loan money to one of my people, to the poor who live with you, you will not be as the usurer; you will not exact interest" (Exodus 22:25). However, with the passage of time the rigor which interest had imposed upon it through religion, which considered it a sin, and through canon law, which declared it illegal, began to slacken and a new concept was adopted, that of reasonable interest. The Industrial Revolution and the consequent necessity of capital for industrial and technical development made general the adoption of statutes fixing the rate of interest on obligations. With assembly line production and the consequent mass distribution of products since the early days of the century, the credit and conditional sales arose in order to channel this production towards the consumer. On the other hand, without this system of distribution, the price would be even higher. To these factors may be added the ingenious pressure of advertising agencies and competition among dealers. Finance companies now appear in the economic panorama, as an indispensable instrument in order to put the article within the reach of the average consumer who can not pay the cash price and in order to permit the producer to employ his capital exclusively in industrial development. The question of the application of usury laws to credit sales then arises.[5]

---

[5] *Usury in Installment Selling*, 9 Ala. L. Rev. 319 (1957); Isaacs, *Installment Selling: The Relation Between Its Development in Modern Business and the Law*, 2 Law & Contemp. Probl. 141 (1935); Berger, *Usury in Installment Sales*, 2 Law & Contemp. Probl. 148 (1935); Encyclopedia of the Social Sciences 193, vol. XV (1944 ed.).

The initial interpretation that prevails in the majority of the states known as the traditional doctrine, holds that usury statutes are not applicable to credit sales. Various reasons have been advanced for this. As a matter of history, it is pointed out that these laws were approved before the economic phenomena of credit sales, particularly consumer goods, so that the Legislature could not have intended to cover them under those provisions; [6] as a matter of exegesis, in denying application through the distinction between a loan and a transaction of conditional sale which is accompanied by the financing of the obligation, which the consumer assumes; [7] as a matter of philosophy, based on the principle that these statutes limit freedom of contract and therefore, should not be extended farther than its clear and precise terms.[8] It has also been said that the provisions on maximum interest respond to the desire to protect the needy debtor, who has no other alternative in the face of his predicament and emergency, than to accept the conditions imposed by the

[6] *Hogg* v. *Ruffner*, 1 Black 115 (1861); *In re Bibbey*, 9 F.2d 944 (Minn. 1925); *Bell* v. *Idaho Finance Co.*, 255 P.2d 715 (Idaho 1953); *District of Columbia* v. *Hamilton National Bank*, 76 A.2d 60 (D.C. 1950).

[7] *General Motors Acceptance Corp.* v. *Weinrich*, 262 S.W. 424 (Mo. 1924); *Commercial Credit Co.* v. *Tarwater*, 110 So. 39 (Ala. 1926); *General Motors Acceptance Corp.* v. *Swain*, 176 So. 636 (La. 1937); *Black* v. *Contract Purchase Corp.*, 42 N.W.2d 768 (Mich. 1950); *Underwriters Acceptance Corp.* v. *Dunkin*, 41 N.W.2d 855 (Neb. 1950); *Nelson* v. *Scarrit Motors*, 48 So.2d 168 (Fla. 1950); *Langille* v. *Central-Penn Nat. Bank of Philadelphia*, 153 A.2d 211, 213 (Del. 1959); *Wyatt* v. *Commercial Credit Corporation*, 341 S.W.2d 348 (Mo. 1960); Anno., *Usury as predicable upon transactions in the form of sale or exchange of commercial paper or other choses in action*, 165 A.L.R. 626 (1946); Anno., *Finance Charges or Time Price Differential in Installment Sales —Usury?*, 24 Mo. L. Rev. 225, 228–231 (1959); cf. Judgment of the Supreme Court of Spain of January 27, 1915 (132 *Jur. Civ.* 182) in which it is said that the Act fixing interest on obligations does not embrace "contracts clearly defined in the Code which partake of a different character and purpose from the loan contracts, even though they may contain an agreement for periodical delivery of money, if they are the price or exchange in the rendering of services or the delivery and transfer of personal or real property."

[8] Fischer, *The Installment Contract and the Usury Laws—A plea for a More Realistic Judicial Approach*, 18 U. of Pitt. L. Rev. 649 (1957).

creditor, while the consumer purchaser is at liberty to acquire or not the merchandise, depending on whether the conditions of the transaction are acceptable to him;[9] that the seller can fix a higher price on credit sales considering that he assumes a greater risk; that on credit sales additional expenses are incurred, such as credit investigations, registry of contracts in public offices, accounting expenses and collection expenses, and others,[10] which would make impossible a reasonable profit margin if considered to be a direct loan.

This interpretation fostered the organization of finance companies, both in the United States and locally. As a matter of fact, local companies followed the norms and practices of American companies, adopting their system of operation and even the form of their contracts, confident that these had already been sanctioned by the courts. However, excess in the so-called financing "charges" and the situation of helplessness in which the consumer had been placed, brought about a reaction in judicial thought which has prompted the mission of looking into the different transactions involved, in order to discover their true substance and intention, forgetting about their exterior form, in order to protect the consumer.[11] Thus, there has been an evolution in doctrine in the consideration of the application of usury

---

[9] *Hillman's* v. *Em'n Al's*, 77 N.W.2d 96 (Mich. 1956); *Luchesi* v. *Capitol Loan & Finance Co.*, 113 A.2d 725 (R.I. 1955); *Nazarian* v. *Lincoln Finance Corp.*, 78 A.2d 7 (R.I. 1951); *Lansdowne Finance Co.* v. *Prusky*, 182 Atl. 794 (Pa. 1936); Anno., *Are Installment Plans Usurious?*, 36 Minn. L. Rev. 744 (1952); Anno., 48 Yale L. J. 1102 (1939).

[10] *Van Asperen* v. *Darling Olds, Inc.*, 93 N.W.2d 690, 695 (Minn. 1958); *Certified Motors, Inc.* v. *Nolan Loan Company*, 122 A.2d 227, 229 (D.C. 1956); *General Contract Purchase Corp.* v. *Propst*, 239 S.W.2d 563 (Mo. 1951); *Commercial Credit Co.* v. *Tarwater*, 110 So. 39 (Ala. 1926); Adelson, *The Mechanics of the Installment Credit Sale*, 2 Law & Contemp. Probl. 218 (1935).

[11] *Commonwealth Company* v. *Fauver*, 101 N.W.2d 150 (Neb. 1960); *Ready Mix Concrete & Concrete Products Co.* v. *Perry*, 123 So.2d 241 (Miss. 1960); *Van Asperen* v. *Darling Olds, Inc.*, 93 N.W.2d 690 (Minn. 1958); *State* v. *Associates Discount Corporation*, 77 N.W.2d 215, 230 (Neb. 1956); *State* v. *Associates Discount Corporation*, 96 N.W.2d 55 (Neb. 1959); *Nazarian* v. *Lincoln Finance Corp.*, 78 A.2d 7 (R.I. 1951).

laws to conditional sales with wider criteria and guided by the concept that interpretation must respond to actual economic reality.[12] We can see that recently a current has been established, called the modern doctrine, which, at least, conditions the original interpretation. These decisions are based on the similarity as to economic effect of a personal loan, the product of which is used to purchase consumer goods and a conditional sale followed by the assignment by the seller to a finance company of the obligations assumed by the consumer. In an effort to reconcile the application of the usury laws with the principle that the seller can dispose of its merchandise at the price that he may see fit, there has been elaborated the doctrine of the "bona fide time price doctrine," which rests on the opportunity that is given to the purchaser to elect between the cash price and the credit price,[13] and that of "reasonable assurance," which is not based precisely on the fact that the consumer actually knows both the cash price and the credit price, but on the direct participation of the financing agency in the sales contract and particularly in the actions of making available the contract forms and the time price schedules, the frequency of the assignment of contracts and in general a conduct which reveals an understanding between the dealer and the com-

---

[12] Raffel, *Conditional Sales Contracts and Usury Laws*, 76 Bank L. J. 829 (1959); Anno., *Finance Charges or Time Price Differential in Installment Sales—Usury?*, 24 Mo. L. Rev. 225, 231–7 (1959).

[13] *Commonwealth Company* v. *Fauver*, 101 N.W.2d 150 (Neb. 1960); *Robb* v. *Central Credit Corporation*, 100 N.W.2d 57 (Neb. 1959); *Thompson* v. *Commercial Credit Equipment Corp.*, 99 N.W.2d 761 (Neb. 1959); *Curtis* v. *Securities Acceptance Corporation*, 91 N.W.2d 19 (Neb. 1958); *McNish* v. *General Credit Corporation*, 83 N.W.2d 1 (Neb. 1957); *McNish* v. *Grand Island Finance Co.*, 83 N.W.2d 13 (Neb. 1957); *Sloan* v. *Sears, Roebuck and Co.*, 308 S.W.2d 802 (Ark. 1957); *Hare* v. *General Contract Purchase Corp.*, 249 S.W.2d 973 (Ark. 1952); *G. F. C. Corporation* v. *Williams*, 231 S.W.2d 565 (Texas 1950); *Daniel* v. *First National Bank*, 228 F.2d 803 (C.A. 5, 1956); *Siebold* v. *Eastermann*, 13 N.W.2d 739 (Minn. 1944); Anno., *Judicial and Legislative Treatment of "Usurious" Credit Sales*, 71 Harv. L. Rev. 1143 (1958); Anno., *Application of Usury Statutes to Credit Sales*, 57 Mich. L. Rev. 298 (1958).

pany, and also the relationship, from the point of view of corporate control, between the dealer and the financing company.[14]

■ It is convenient to point out that even in those jurisdictions in which the minority rule has been enunciated, the effects of the decisions have been of a prospective character, and have in no case been extended to contracts executed or relationships established before the new norm.[15] This attitude of caution tends to avoid violent dislocations in an economic system which has been structured with confidence in the state of judicial decisions which sanctioned the inapplicability of these provisions on usury to conditional sales.

Apparently part of the reticence of courts in intervening more actively in the problem that we are discussing is based on the criteria that this situation demands rather legislative action. In order to protect consumers from exhorbitant financing charges various measures have been adopted which tend to regulate the extension of credit, and at the same time keep a reasonable profit margin in order to stimulate the

[14] *State* v. *Associates Discount Corporation,* 96 N.W.2d 55 (Neb. 1959); *Crisco* v. *Murdock Acceptance Corporation,* 258 S.W.2d 551 (Ark. 1953); *Hare* v. *General Contract Purchase Corp.,* 249 S.W.2d 973 (Ark. 1952); *Associates Investment Co.* v. *Sosa,* 241 S.W.2d 730 (Texas 1951); *Associates Investment Co.* v. *Thomas,* 210 S.W.2d 413 (Texas 1948); Anno.,· *Transfer of Installment Contract to Finance Company as Evidence of Loan Transact'on,* 37 Minn. L. Rev. 223 (1953); Anno., *Usury Statutes: Their Applicability to Credit Sale Followed by an Assignment to a Lending Agency,* 43 Idaho L. Rev. 87 (1957); *cf. Battle* v. *Patsy Auto Sales,* 99 N.E.2d 812 (Ohio 1951); *Curtis* v. *Securities Acceptance Corporation,* 91 N.W.2d 19, 26 (Neb. 1958); *Nelson* v. *General Credit Corporation,* 90 N.W.2d 799 (Neb. 1958).

[15] *Great Northern Ry.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358 (1932); *Hare* v. *General Contract Purchase Corp.,* 249 S.W.2d 973 (Ark. 1952); *County of Los Angeles* v. *Faus,* 312 P.2d 680 (Cal. 1957), in which it was stated that there is no constitutional objection to a reviewing court's making a choice for itself, in announcing a ruling, if it shall operate retrospectively, which is the general rule, or prospectively only, such determination depending upon the equities in each case; *Arizona State Tax Comm'ssion* v. *Ensign et al.,* 257 P.2d 393 (Ariz. 1953); *Parker* v. *Port Huron Hospital,* 105 N.W.2d 1 (Mich. 1960); *Phillips Exeter Academy* v. *Gleason,* 157 A.2d 769 (N.H. 1959); Anno., 28 Ill. L. Rev. 277 (1933); 17 Minn. L. Rev. 811 (1933); 11 N. C. L. Rev. 323 (1933).

economy: 1—it is required that the finance companies obtain a license; [16] 2—the terms of the sale are required to be set out clearly and a copy of the contract be turned over to the debtor, who must recognize in writing that he has received the same; and besides, under pain of nullity, it is required that the contract be completed before proceeding to its execution, thereby avoiding the signature of contracts in blank; [17] 3—the fixing by statute of a maximum limit to financing charges, either through a fixed per cent or a scale which depends on the classification of the object of the contract, the risk involved in the transactions and other factors; and, in some cases, it is required that finance companies file with the appropriate government agency a breakdown of the different items included in the term "financing charges"; [18] 4—it is required that in cases of prepayment by the consumer, a proportional share of unearned finance charges be returned to him; 5—the participation of the seller through a dealer's bonus given to him by the finance company is eliminated; [19] and 6—the amount that may be charged as legal expenses in case of foreclosure is limited. In general,

---

[6] See House Bill No. 93, pending consideration before the Legislative Assembly.

[7] Act No. 13 of April 12, 1955 (Sess. Laws, p. 50) which amended § 2 of the Conditional Sales Act, No. 61 of April 13, 1916 (Sess. Laws, p. 123, 10 L.P.R.A. § 32) provides, among other things, that "every conditional sale contract shall be executed in writing, and shall not be signed until after it contains everything agreed upon by the parties thereto" and that "in every conditional-sale contract there shall be set forth the price of the item the object of the contract, the down payment made, the balance due, including, *individually* set forth, any sum paid as insurance and the coverage of the policy; financing expenses and any other expenses, charges collectable in case of default, and amount and number of installments payable, as well as the surcharge in terms of annual percentage on the cash price of the item, as represented by the sum of all the charges above mentioned, except the one for default." (See *Millán* v. *Caribe Motors Corp.*, 83 P.R.R. 474. (Italics ours.)

[8] See H. B. No. 93, *supra*.

[19] In those states in which the participation of the dealer in financing charges is permitted it is at least required that he provides some service in exchange, such as obtaining a credit report or supplying the forms of the contract, etc.

see, on this point, Anno., *Are Installment Plans Usurious?*, 36 Minn. L. Rev. 744, 753–756 (1952); *Consumer Credit Symposium: Developments in the Law*, 55 Nw. U. L. Rev. 301–418 (1960); *Nebraska Usury Statutes, The Time Price Scale Transaction and the Installment Sales Act*, 40 Neb. L. Rev. 433–465 (1961). A summary of the present legislation in several states to regulate conditional sales is contained in 9 Ala. L. Rev. 336–7, and for loans of small amounts see 8 Law & Contemp. Probl. 134–145 (1941).

— C —

## THE PRESENT CASE

In *International General Electric* v. *Buscaglia, Treas.*, 66 P.R.R. 249 (1946), we said at page 261 that "we assume, without deciding, that if the issue were presented in an appropriate case . . . we would . . . hold that such 'finance charges' when made in connection with a conditional sale, are not usurious because they are part of the purchase price, and not interest." As may be appreciated immediately what has been set out was unnecessary for the purpose of deciding the case which was being considered, and it was announced in 1946 when the problem of excessive finance charges had not yet reached the alarming stage as it has during the last decade. On the other hand, at that time, the decisions were almost unanimous with respect to the inapplicability of usury provisions to conditional sales. These judicial norms were based on the prevailing reserve respecting the regulation of commerce and an absolute concept of laissez-faire as to private enterprise. Actually the power of the government to regulate business for the protection of the public in general, and in particular, of consumers, can not be seriously doubted. It is because of this that this part of the opinion of the *International General Electric* case does not have any further reach other than an anticipated comment on a problem which had not come up and which it was not necessary to decide at that time.

It can not be ignored that the mechanics of a conditional sale and the assignment of the contract to a financing company in reality engender a tripartite relationship: the dealer supplies the merchandise, the company grants the financing, and the consumer pays, for the merchandise as well as for the financing. It is obvious that between the consumer and the financing company there exists a relationship whenever certain circumstances to which we will immediately allude are present. *Limiting Consumer Credit Charges by Reinterpretation of General Usury Laws and by Separate Regulation*, 55 Nw. U.L. Rev. 303 (1960).

After considering with serenity the different interpretations on this thorny matter, and above all, the probable impact on the Puerto Rican economy, we adopt as the *prospective* norm in this jurisdiction that transactions such as in the present case—a sale on credit followed by the financing of the purchaser's obligation—may be subject to the provisions which fix interest on obligations, that is, subject to be declared usurious. *Everything depends on the circumstances of each particular case.* When we are not dealing with a bona fide transaction in which the seller merely raises the price in order to compensate for the risk and for the higher cost of a credit sale, but with a mere subterfuge to cover up a rate of interest higher than that permitted by law, we will apply without vacillation the usury provisions. If the seller has raised the credit sales price with the reasonable certainty that the obligation of a purchaser will be discounted or negotiated by a financing company, the transaction will be considered as in reality a loan, and may be attacked as tainted by usury. The fact that the finance company may furnish contract forms and rate charts in order to determine the amounts by which the credit price will differ from the cash price are circumstances which indicate the existence of this reasonable certainty, as will also be the frequency of the transactions between the dealer and the finance company and the uniform pattern of business

between them, specially when the dealer carries out the financing of the purchaser's obligation. With the exception of a reasonable charge for the additional costs that financing implies, and which in this case in particular was fixed at two per cent, and the payment of insurance premiums (*Griffin v. Murdock Acceptance Corporation*, 303 S.W.2d 242 (Ark. 1957)), any additional amount which computed annually exceeds the maximum rate of interest fixed by law will make the transaction usurious. The practice of charging the consumer a fixed amount which will be credited to the dealer as a bonus constitutes the exaction of additional interest, a practice of which we disapprove. And over every other consideration, the practice of initially charging the maximum rate of interest, for instance, nine per cent annually over the total time price (flat rate), a principal which is gradually reduced through periodic payments—usually monthly—in effect constitutes the payment of usurious interest, since payments are being made on an amount which has not been enjoyed totally during the term of the contract, *Harrell* v. *Colonial Finance Corporation*, 341 S.W.2d 545 (Texas 1960); *Hillman's* v. *Em'n Al's*, 77 N.W.2d 96 (Mich. 1956); *Bird Finance Corporation* v. *Lamerson*, 6 N.W.2d 732, 737 (Mich. 1942); Anno., *Usury Interest in Advance*, 57 A.L.R.2d 630, 663–668 (1958). Interest should be computed taking into account periodic payments, even when it is charged initially. We recognize that the possibility exists that this interpretation will affect credit sales, but we can not close our eyes to a local situation which requires a prompt solution. Proper action should be taken by the Legislature to approve regulatory legislation on the extension of credit to the consumer, such as the bill actually under consideration. In any case, all that we are deciding is that the assignment of a conditional sale contract and of a chattel mortgage guaranteeing a total time price is not immune from attack by the consumer since it is tainted by usury. We repeat that

everything will depend on the particular circumstances of each case.

▓▓▓ In view of the fact that the norm which we have adopted is of a prospective character only,[20] and does not apply to contracts executed or relationships created before this date, the judgment entered by the trial court should be affirmed. But even if this were not the case, the same solution would be necessary for the additional reasons which we shall now set out. As the trial court set out in its conclusions of law, the plaintiff can not now raise the usurious character of the contracts involved.

"Considering again the transactions in question, for the defendant to intervene it was necessary that a transaction of purchase and sale should have taken place between Soler & Mascaró and a third person. Without the latter the former could not exist. But notwithstanding the fact that the plaintiff charges usury, he agrees with the view of the court that the charge of $233.06 which Soler & Mascaró made to the purchaser of the vehicle does not constitute usury nor interest collected in violation of the law. For the plaintiff usury commences when Soler & Mascaró assigned to the defendant the conditional sales contract containing the same price fixed for the credit sale.

"Upon reaching this point we must face another affirmative defense of the defendant to the effect that even assuming that loan transactions had been made, as alleged by the plaintiff, and even assuming that usury interest had been collected, the plaintiff is not the party actually in interest or with a right of action, insofar as said interest, if any, was paid to the defendant by the purchasers of the vehicles and Soler & Mascaró was not prejudiced economically by payment thereof even if it was excessive.

"The evidence showed that the purchasers of the motor vehicles paid to the defendant the deferred balances which

---

[20] Although we are not dealing with the typical case of overruling a previously established doctrine, it is not less true that there could have been reliance on the case of International General Electric. Besides, the majority rule prevailing in the United States was certainly considered. We do not believe that the equities of this case require retroactive application of the norm we have announced, since this would cause a grave dislocation in the economy.

already included the financial charges, for more than 97% thereof, and in 92% of the cases. They paid the amount of $1,091,498.90 of the entire amount of $1,135,293.88."

Since the interest in excess of the legal margin was satisfied by the purchasers, the dealer or his trustee can not now recover on the basis of these transactions. With regard to those contracts in which the defendant charged to the account of the bankrupt corporation payments because of its subsidiary responsibility in the case of default of the conditional purchasers, the relationship between the parties is governed by the terms of the dealer's retail agreement. To this class of contracts we can not extend the protection of the announced doctrine, because this doctrine answers principally to the obligation of protecting the consumer who needs credit. Besides, said contract with respect to the relationships of the dealer and the financing company is but a mere modality of the assignment of credits, that is, of a sale. And as the trial court found, said agreement does not answer to the desire of covering up a loan operation, but it contained the obligation that both parties freely agreed to and assumed with full knowledge of its legal consequences. *Cf. Klett* v. *Security Acceptance Co.,* 242 P.2d 873 (Cal. 1952); *Cullum* v. *General Motors Acceptance Corp.,* 68 F.2d 310 (C.C.A. 5, 1933); *General Motors Acceptance Corp.* v. *Mid-West Chevrolet Co.,* 66 F.2d 1 (C.C.A. 10, 1933); *Walcott* v. *Skilton,* 94 A.2d 792 (Conn. 1953). Anno., *Protection of Borrowers in Distribution Finance,* 60 Yale L. J. 1218 (1951).

Notwithstanding all this, the appellant insists, that as trustee of a bankrupt corporation, he can exercise the cause of action that corresponds to the motor vehicle purchasers, since he *represents* all creditors. It does not require great elaboration to dispose of this point. The provisions of the Bankruptcy Act to which the trustee makes reference merely establish that the trustee is invested with all the rights and causes of action which correspond to the bankrupt,

and in defense of creditors, he may file all actions whose effect will be to increase the assets subject to distribution among those creditors, that is, he must carry out all the actions necessary to increase the bankrupt estate, as for instance, actions to set aside sales in fraud of creditors before bankruptcy, or acts and contracts which constitute preferences to other creditors. *In re Jacoby*, 138 F.2d 42 (C.C.A. 3, 1943); § 70 of the Bankruptcy Act, 11 U.S.C. § 110; 4 Collier, On Bankruptcy 926–929, 1238–1281 (14th ed.). But not even through great use of the imagination can it be held that the trustee can take upon himself the representation of creditors in order to carry out suits which will increase the particular assets of each creditor. As we have set out previously, any cause of action for the exaction of usurious interest can only correspond to the person who actually made those payments, in this case, to the purchasers of the automobiles, whose assets were the only one injured as a result of said charges.[21] Under the findings of fact admirably summarized by the trial court, little could Soler & Mascaró Auto Corporation claim through its trustee, since, at least, it was the effective instrument for initiating and permitting the charging of this interest in excess of the legal margin. *Cf. Cámara Insular, Etc.* v. *Anadón, S. en C., ante,* p. 360

Section 70 (a) (6) of the Bankruptcy Act expressly authorizes the trustee to initiate those actions which correspond to the bankrupt and which flow out of usurious transactions. But this refers to transactions in which the bankrupt has been the affected party, since it is considered that the exaction of usurious interest constitutes an injury to the assets of the bankrupt, *Reed* v. *American-German National Bank*, 155 Fed. 233 (Ky. 1907); *Lasater* v. *First Nat. Bank*, 72 S.W. 1057 (Texas 1903); *Ripple* v. *Mortgage and*

---

[21] It has been held in Spain that the action for nullity granted under the Act of July 23, 1908 may be exercised only by the contracting party affected. (Judgment of May 23, 1929, 189 *Jur. Civ.* 404.)

*Acceptance Corp.*, 137 S.E. 156 (N. C. 1927) ; *cf. Kelter* v. *American Bankers Finance Co.*, 160 Atl. 127 (Pa. 1932), and even under these provisions the trustee has been denied certain defenses and remedies which are set out as personal remedies to the particular debtor under the local statutes involved. *Chraime* v. *Catton*, 183 N.Y.S.2d 874 (1959) ; *New York Credit Men's Ass'n* v. *Manufacturers Discount Corp.*, 60 N.Y.S.2d 2 (1945) ; Krause, *The Treatment of Usury in Bankruptcy Proceedings*, 29 N.Y.U. L. Rev. 1083 (1954). In *In re Alday Motor Co.*, 50 F.2d 228 (D. C. Tenn. 1930), the trustee of the bankrupt claimed excessive interest charges, but it was held that since the record showed "that such usury interest was in fact paid by purchasers (not by the bankrupt) and simply passed on by the bankrupt to one of the petitioners," the trustee has no claim to it.

## III

 There remains to consider the question raised by the appellant with reference to the causes of action which the trial court dismissed, without prejudice, on the ground that the appropriate forum to attempt recovery was the Bankruptcy Court. We are dealing with the claims for the amount of $80,000 which was charged by the defendant to the plaintiff's reserve account for expenses incurred in repossession and sale of motor vehicles subject to contracts of conditional sale which had been assigned to Financial Credit Corporation by Soler & Mascaró Auto Corporation, and for the sum of $5,217.74 which was reimbursed to purchasers when Soler & Mascaró did not pay the insurance companies the insurance premiums which had been charged to said purchasers. It is clear immediately that we are dealing with claims related to the assets of a bankrupt, that is, the reserve in favor of the dealer created by virtue of the terms of the dealer's retail agreement, over which the trustee was invested with absolute title. The actions of the defendant involved here are those *after* the filing of the initial petition in

bankruptcy and as a consequence of the final breakup of relationships between the defendant and Soler & Mascaró Auto Corporation, represented by its trustee. We must make clear at this point that the trustee did not repudiate at any moment the said contract, § 70 (*b*) of the Bankruptcy Act, 11 U.S.C. § 110 (b). If we were dealing with a cause of action under subds. 5 and 6 of § 70 (*a*) of the Bankruptcy Act, 11 U.S.C. § 110, which passed to the trustee as part of the assets, the trustee would have to file it in the Puerto Rican courts unless the defendant were to consent to submit to federal jurisdiction, *Herbert* v. *Sullivan*, 123 F.2d 477 (C.C.A. 1, 1941) ; *Charness* v. *Katz*, 48 F.Supp. 374 (Wis. 1943) ; 4 Collier, *op. cit.* at 1247. However, when we are dealing with claims which have arisen after the filing of a petition in bankruptcy, the local courts have concurrent jurisdiction with the Bankruptcy Court on those claims, *French* v. *R. P. Smith & Sons Co.*, 84 N.W. 44 (Minn. 1900) ; *Westall* v. *Avery*, 171 Fed. 626 (C.C.A. 4, 1909) ; 2 Collier, *op. cit.* at 600. In order to file said actions it is not indispensable that the consent of the Bankruptcy Court be obtained, *Boyle* v. *Lewiston Trust Co.*, 136 Atl. 292 (Me. 1927) ; *Harlin* v. *American Trust Co.*, 119 N.E. 20 (Ind. 1918) ; 1 Collier, *op. cit.* at 158–159, pp. 604 and 1744 of vol. 2; *cf. Palmer* v. *Larchmont Mann. Co.*, 30 N.E.2d 599 (N.Y. 1940), although this is the best practice, *In re Meadows, Williams and Co.*, 181 Fed. 911 (N.Y. 1910) ; *cf.* as to the necessity of express authorization when the action is pending at the time of the filing of the petition in bankruptcy, *Hall* v. *Main*, 34 F.2d 528 (Ill. 1929). In general as to the power of the trustee to commence and engage in litigation, see, 2 Collier, *op. cit.* at 1742–1745, § 47.05. This being so, we must decide whether the two causes of action to which we have referred lie.

▮ With respect to the amounts charged for expenses incurred in proceedings to repossess and sell motor vehicles

subject to contracts of conditional sales assigned to Financial Credit Corporation, it is sufficient to say that this was expressly covered and sanctioned in the dealer's retail agreement which governs the relationships between the parties (par. 4 in fine). And with respect to the amounts returned to the purchasers of the vehicles due to premiums which Soler & Mascaró Auto Corporation had charged them and which it unjustly retained without covering the corresponding risks as appeared from the contracts of conditional sale—which amounts had been turned over to the defendant for this specific purpose—it is enough to say that this can be considered as a "charge for the reimbursement of any expense incurred in by Financial Credit Corporation with respect to said documents" as stated in par. 5(*b*) of the referred agreement between the parties.

As to the profits produced by the funds held in reserve it is not necessary to elaborate an extensive discussion in order to conclude that the appellant is wrong. We are dealing with mere accounting entries, subject to a final liquidation under the terms of a contract between the parties, the effect of which was to turn said reserve into an additional guarantee by the dealer of his performance of the obligations assumed. As projected by the imagination in a pyramid-like fashion it is not strange that the claim exceed the total of the fund itself. On the other hand, if the claim had been proper, it was not adequately proved—as the plaintiff had to prove—that the supposed profits were derived by the defendant from the reinvestment of these moneys. *De la Fuente* v. *A. Roig Sucrs.*, 82 P.R.R. 499, 518 (1961); *Sánchez* v. *Cooperativa Azucarera*, 66 P.R.R. 330, 337 (1946); *Boria* v. *The Maryland Casualty Co.*, 60 P.R.R. 808 (1942).

Finally, the allegation of bias, partiality and prejudice on the part of the trial court does not merit discussion.

The judgment of the trial court rendered on September 17, 1954 will be affirmed.

Mr. Chief Justice Negrón Fernández, Mr. Justice Pérez Pimentel, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra did not participate herein.

Mr. Justice Belaval states that if the ruling laid down in this case had not been of a prospective character, he would not have participated in the solution thereof, but since it has a prospective effect, and pursuant to the rule of necessity to constitute the majority of the Court in full, he participates in the decision since he fully agrees with the same.

## APPENDIX "A"

### "FACTS PROVED AND FINDINGS OF FACT

"(1) Plaintiff Manuel Monclova is the Trustee of the bankrupt corporation Soler & Mascaró Auto Corporation. On March 12, 1952, the Judge in Bankruptcy filed in the bankrupt proceedings of Soler & Mascaró a special report addressed to the United States District Court for Puerto Rico stating that the Trustee had asked leave to file a complaint, in representation of the bankrupt, against Financial Credit Corporation, said complaint being based on a certain contract between Financial Credit and the bankrupt corporation which it was alleged constituted a loan and not the purchase of negotiable documents, and that, therefore, the bankrupt corporation had been charged usurious interest; that it was also alleged that Financial Credit Corporation had unjustly enriched itself in managing the money on the bankrupt corporation without authorization; and that Financial Credit had unlawfully withheld the money paid the bankrupt corporation, thereby causing its economic collapse. The report further stated that the Trustee had requested the appointment of counsel who represented Soler & Mascaró in the bankrupt proceedings to join counsel for the Trustee in this complaint, and the appointment was favorably recommended. By order of March 14, 1952, the United States District Court for Puerto Rico authorized the appointment of the aforesaid counsel for Soler & Mascaró to represent the Trustee of Soler & Mascaró, together with the latter's counsel, in said complaint in representation of the bankruptcy against Financial Credit.

"(2) The bankrupt corporation Soler & Mascaró Auto Corporation was organized under the laws of Puerto Rico on August 15, 1947, with domicile and principal office at 359 Ponce de León

Avenue, Stop 6½, Puerta de Tierra, to engage in the purchase and sale of automobiles, trucks, bicycles, motorcycles, tires, tubes, accessories, and spare parts for motor vehicles and other vehicles, machinery, oils and lubricants, electrical appliances, and repair-service shop. It was incorporated with a paid-in capital of $102,000 from an authorized capital of $250,000, its incorporators being Efraím Soler and his wife with 340 shares of $100 each; Mariano Mascaró and his wife with 340 shares, and Oscar Michelena and his wife with 340 shares. The contribution of Mascaró was made wholly in cash; Soler contributed with his share in the partnership Belaval & Soler, which business came under the new corporation, and Michelena contributed with $4,000 or $5,000 in cash and the rest of his share in the partnership Belaval & Soler. Soler was appointed President and Manager, and Mascaró, Treasurer and Secretary, and it was agreed to acquire the assets and liabilities of the firm Belaval & Soler & Co. *S. en C.,* as of August 1, 1947, as a reorganization and continuation of its business.

"(3) Incorporators Efraím Soler and Mariano Mascaró had vast experience in the business of cash and conditional sales of motor vehicles and their parts and accessories. Soler, although an attorney by profession, did not practice as such in Puerto Rico, but worked with the firm E. Solé & Co. and later organized the firm Belaval & Soler, which was engaged in said business of which he was its manager. Mascaró worked since 1919 with firms engaged in the sale of automobiles and organized the firm E. Solé & Co., of which he was its manager.

"(4) At a meeting of the Board of Directors of Soler & Mascaró held on January 7, 1948, it was agreed to raise the paid-in capital of the corporation with the profits realized up to January 31, 1948, and it was agreed to readjust the salaries of the officers and to pay, in addition to the monthly compensation already paid, $15,380 to Soler; $15.38, I mean, $15,380 to Mascaró; and $1,240 to Michelena.

"By resolution of the Board of Stockholders adopted on February 14, 1948, the paid-in capital of Soler & Mascaró was increased to $150,000, capitalizing $38,700 out of the profits which amounted to $39,040.05 obtained up to January 31, 1948, and issuing 93 additional shares to the stockholders. The increase of capital was made as a necessary step to obtain the credit that the corporation needed to expand its business.

"(5) By resolution of the Board of Stockholders of July 31, 1948, the authorized capital of Soler & Mascaró was increased from $250,000 to $1,000,000 and the paid-in capital from $150,000 to $300,000. The latter was carried out by capitalizing, by means of dividends in the form of shares, the sum of $75,000 out of the net profits reported on July 30, 1948, totalling $77,596.80.[1] (The evidence further showed that these profits amounted, as of September 30, 1948, to $63,626.63, according to the auditing of the firm Sparrow Waymouth & Co. The profits for the entire year up to January 31, 1949, netted $77,943.56), after deducting a reserve for income tax and $63,000 for distribution among the directors in a proportion of $30,000 for Soler, $30,000 for Mascaró, and $2,400 for Michelena, and issuing 750 additional shares at a par value of $100, which were subscribed and paid by Jaime Ramón Brugat. The entire net profits referred to and the previous surplus of $340.05 were distributed in the form of cash shares.

"(6) Soler & Mascaró was engaged principally in the importation of De Soto automobiles and Goodrich tires, which it sold at wholesale to subdealers and at retail in cash and in installments. The price fixed for installment sales was greater than that for a cash sale. This increase in the cash price was intended to take care of certain additional operation expenses incurred in the instalments sales, among others, the need for obtaining information on the buyer's credit, the maintenance of a collection department with the necessary accounting and additional records, equipment and employees for that work, registration expenses and registration of conditional contracts and chattel mortgages, collection proceedings and other related operation expenses incurred in the course of the installment sale of a vehicle up to the full payment of the price.

"(7) Until the middle of the year 1948, Soler & Mascaró obtained financing for its business of installment sales from the Banco Popular de Puerto Rico. At the beginning Soler & Mascaró deducted the conditional sales contracts and the personal promissory notes of the vendees of vehicles with that Bank, receiving from the latter 90 per cent which was credited to its current account and thereafter 80 per cent of the amount of the contract and of the note. The Bank withheld 10 per cent and thereafter 20 per cent as reserve and marginal security for its additional protection. On the said 90 per cent and thereafter

on the 80 per cent it charged interest at 5 per cent per annum, which was credited to Soler & Mascaró.

"The system was later changed. Soler & Mascaró then negotiated loans directly with the Banco Popular with the signature and delivery of its own obligation, which were also guaranteed personally by Mariano Mascaró. These loans were obtained up to a limit of 80 per cent of the value of the conditional contracts and promissory notes of the vendees of vehicles, which were assigned and delivered to the Bank, together with the direct obligation of Soler & Mascaró, and on which interest at 5 per cent was charged. The remaining 20 per cent was intended as a security margin for the Bank.

"(8) Sometime in June or July 1948, the portfolio of documents which Soler & Mascaró negotiated with the Banco Popular was approximately one million dollars. The Bank refused to finance further the corporation's instalment sales on the ground that Soler & Mascaró's capital was not substantial enough to answer for its portfolio and volume of business with the Bank. The action of the Banco Popular brought about a critical situation, since Soler & Mascaró was not in a position to operate without the financing of its instalment sales, unless it should have available a large working capital. After many unsuccessful steps with the Banco Popular not to withdraw the credit for its retail business, Soler & Mascaró sought without success to obtain such credit and the liberation of its portfolio in other local banks. As of the refusal of the Banco Popular, and in a matter of days, Soler & Mascaró already had in its possession some $70,000 worth of contracts and personal promissory notes, which kept increasing. In view of this situation, Efraím Soler and Mariano Mascaró decided to organize a finance corporation for the purpose of undertaking the financing of Soler & Mascaró's business. The defendant was thus organized.

"(9) Efraím Soler and Mariano Mascaró took it upon themselves, by calling personally and by letter, throughout the Island, to invite a number of businessmen, capitalists, industrialists, and professionals, to get them interested in the new sales-finance company and in the advisability of organizing the same. Some were agreeable, others were not, and on July 7, 1948, Efraím Soler, Mariano Mascaró, and 13 other persons signed an agreement binding themselves to subscribe jointly and to pay $237,500 of capital shares of the proposed company, in which it was set

forth that the purpose was to engage in 'the purchase, acquisition, negotiation, discount, sale, rediscount of negotiable instruments ( . . . ), commercial paper ( . . . ), or securities of all kinds.'

"In this agreement Efraím Soler and Mariano Mascaró bound themselves to purchase $30,000 each in capital shares of stock of the company. Actually, they contributed only $1,000 each, since they had available for the remaining contribution the reserves which Soler & Mascaró had in the Banco Popular, which the latter refused to deliver.

"By July 1, 1948, Soler & Mascaró had already written to the local banks informing them that its petitions for credit included only the wholesale line because a finance company was being organized to take care of its business. It was further stated that this finance company would receive the benefit of the finance charges made by the automobile dealers, which in all cases ranged from 14 per cent to 17 per cent of the deferred balance. It was also anticipated that the reserve which the proposed finance company would withhold would range from 10 per cent to 20 per cent.

"(10) On July 19, 1948, the defendant was incorporated under the name of Financial Credit Corporation, for the purposes aforesaid and to loan money with or without interest. Its authorized capital was $1,000,000 and its paid-in capital $157,500. Its domicile and principal office were registered provisionally as the same domicile and office of Soler & Mascaró situated at 359 Ponce de León Avenue. For the time being, the incorporation expenses were defrayed by Mariano Mascaró although they were later reimbursed. The first meeting of incorporators and stockholders was called and opened on July 28, 1948, in the premises of Soler & Mascaró, under the provisional presidency of Mariano Mascaró. The business in which the company would engage was fully discussed with the active participation of Efraím Soler and Mariano Mascaró, and a committee was appointed, of which Soler was a member, to prepare and draft the finance plan which would serve as guidance to the corporation in its operations of rediscount of commercial papers.

"(11) On August 4, 1948, Financial Credit held a second meeting of incorporators and stockholders. Mascaró informed on a conference which he had had with William A. Waymouth

of the firm 'Sparrow Waymouth & Co.,' on the advisability of procuring the finance plan of the 'General Motors Acceptance Corporation,' as this plan had been tested in practice and in long years of experience. He further informed that he was able to obtain sufficient information on the plan of the General Motors through José A. Tulla (who was later General Manager of Financial Credit), and that he proceeded together with Soler and Tulla to discuss the same and to make the necessary adaptations of the said plan of the 'General Motors,' as it appears from a memorandum submitted by Tulla, dated July 31, 1948, copies of which had been distributed among the stockholders. This memorandum was mimeographed in the office of Soler & Mascaró. The memorandum embodying the finance plan and a supplemental memorandum by Tulla, dated August 4, 1948, were then fully discussed at that meeting at which Efraím Soler and Mariano Mascaró took active part. Several amendments and modifications were introduced to the plan and, as thus amended, it was approved. The rates fixed for finance charges were based on Soler & Mascaró's own experience in this type of business.

"The by-laws of the corporation were discussed and approved at the same meeting with the active participation of Soler and of Mascaró, and the candidates for directors proposed by Soler were elected. The directors then met and approved the nominees also proposed by Soler, Mariano Mascaró having been elected President and Soler, Assistant Secretary.

"On motion of Soler, José A. Tulla was appointed to the office of General Manager of the corporation with a compensation of $500 monthly. Finally, Soler informed those present of the conversations had between him and Rafael Carrión of the Banco Popular in connection with the granting of credit by that Bank to the new corporation, defendant herein.

"(12) On August 18, 1948, Financial Credit held its second meeting of directors. Secretary Juan Enrique Géigel reported on the orderly revision of the finance and operation plan already approved by the stockholders, including certain details which had not been included thereinbefore. The revised plan was opened to discussion, at which Efraím Soler was the spokesman and proposed most of the amendments introduced therein in its fundamental finance aspects and mutual relations between the corporation and its future customers. On his motion, the reserve to be withheld by the corporation out of the principal of

each contract was finally fixed at 5 per cent, and it was provided that the reserve would consist of the said 5 per cent and of a bonus of 1½ per cent of the principal which would be credited to the dealer, and that Financial Credit could withhold such reserve up to 10 per cent of the total balance due on the contracts. Soler also took active part in the discussion of the liability of the customers of Financial Credit to the latter, and he proposed, and was accepted, that in the event of repossession or foreclosure the customer would be obliged to take the vehicle repossessed or foreclosed. Soler also discussed and objected to or attacked all the amendments to the plan suggested by others which, in his opinion, were not wholly acceptable to the customers. The finance plan thus discussed and amended was finally approved.

"(13) At a meeting of directors of Financial Credit held on September 30, 1948, Mariano Mascaró tendered his resignation as president, in part because of his position in Soler & Mascaró and because his person in the presidency of Financial Credit could weaken the latter's position in its banking relations. In his letter of resignation Mascaró stated that he would continue to cooperate with the corporation, to which he textually referred as 'fruit of my initiatives.' His resignation having been accepted, he continued as Director and Assistant Treasurer.

"(14) The form of the finance contract to be subscribed by every automobile dealer who wished to discount his commercial paper with the corporation, was approved at that same meeting. That contract embodied the finance plan already adopted, and, like the latter, followed fundamentally the practices generally established by finance corporations in the United States for this type of business. The contract, totally drafted and approved in English, was entitled 'Dealer's Retail Agreement.' The same was signed on November 17, 1948, between Soler & Mascaró and the defendant Financial Credit to govern the relations between them in their business of financed sales. The following is the English text of the said contract, in which it was stated that:

" 'The undersigned (hereinafter called 'The Company'), being desirous of financing installment sales of motor cars and/or motor trucks, will from time to time offer you for purchase such conditional sales agreements, chattel mortgages or other lien instruments as may be acceptable to you (hereinafter referred as 'Instrument' or 'Instruments'). In order to induce such

purchases, 'The Company' makes the following representations, warranties, covenants and agreements:

" '1. That all instruments submitted shall represent deferred payment obligations for the amount therein set forth, not subject to any disputes, offsets or counterclaims, of bona fide purchasers having legal capacity to enter into such instruments, to whom 'The Company' will have sold and delivered motor cars and/or motor trucks therein described; that the 'Balance Payable in Installments (Time Balance)' set forth in all instruments, will have been calculated substantially according to the most recent chart furnished by you; that the cash payment was received and made as indicated in said instruments, and will not have been advanced or furnished by 'The Company'; that each sale will have been made on the basis of a minimum down-payment of one-third ($\frac{1}{3}$) of the net cost to the purchaser and a maximum of eighteen (18) months for the payment of the 'Balance Payable in Installments' in the case of new automobiles or trucks, on the basis of a minimum down-payment of forty per cent (40%) of the net cost to the purchaser and a maximum of twelve (12) months for the payment of the 'Balance Payable in Installments' in the case of used automobiles or trucks, and, in the case of used automobiles or trucks of the latest year model, on the basis of a minimum down-payment of one-third ($\frac{1}{3}$) of the net cost to the purchaser and a maximum of fifteen (15) months for the payment of the 'Balance Payable in Installments'; that the motor cars and/or motor trucks described in instruments at the time of the purchase thereof by you will be encumbered with a valid first chattel mortgage in favor of 'The Company' that will be properly recorded as such first lien in the appropriate Registry of Property of Chattel Mortgages or will have been sold under a valid conditional sales contract that will be properly recorded as such in the appropriate Registry of Conditional Sales Contracts; that it will be the responsibility of 'The Company' to record said first chattel mortgage and/or said Conditional Sales Contract; that all statements of fact within the knowledge of 'The Company' contained in instruments and in the credit statements accompanying each instrument are true; and that 'The Company' has not knowledge of any fact which would impair the validity of any instrument. 'The Company' will fulfill completely all obligations on its part to be performed under the terms, covenants and conditions of instru-

ments, and 'The Company' agrees to indemnify you and hold you harmless against any claim of any purchaser arising out of any instrument, interposed by way of defense, dispute, offset or counterclaim, including, but not limited to, claims for performance by 'The Company' of anything on its part to be performed under the terms of any instrument.

" '2. It shall have the sole right to make collections on instruments, and to exercise legal action for the enforcement of the terms and conditions thereof, or for the repossession of the vehicles described therein, or for the foreclosure of the chattel mortgages. All legal fees, court expenses and costs incurred therein shall be chargeable to 'The Company.' 'The Company' agrees not to solicit nor to make any collections, repossessions or foreclosures under any such instruments, except as authorized by you from time to time, and 'The Company' agrees to hold all repossessions or foreclosures in trust for you without charge to you and to deliver the same to you upon demand, unless for any reason the instruments under which repossession or foreclosure was made have been repurchased by 'The Company' from you. 'The Company' further agrees to take up any and all repossessed or foreclosed vehicles whenever you may request it to do so. You may continue to collect on all instruments until the same have been repurchased or paid for by 'The Company.' 'The Company' will note on its books reference to the acquisition of instruments by you. You shall have the right to audit 'The Company's' books, accounts, correspondence, records or other papers relative to instruments acquired by you hereunder, and to make extracts therefrom at any time. You shall not be required to file, record, refile or re-record or satisfy any instruments, but 'The Company' agrees, as its own expense, to do so if requested by you.

" '3. Notes shall be endorsed in blank by 'The Company,' with recourse, and all instruments shall be assigned to you in form and manner satisfactory to you, but should 'The Company' omit to do so, you or your representative may place any necessary or appropriate endorsement or assignment thereon, and on any remittances. It is understood that you may reject or refuse to purchase any instruments presented to you, with or without cause, and the acceptance of any one or more instruments shall not be deemed to obligate you to accept any other instruments. 'The Company' hereby agrees to pay any and all

installments due under any of the notes or instruments endorsed to you hereunder that may stand in default for thirty (30) days. or more. If the default shall continue as to three (3) consecutive installments, 'The Company' hereby further agrees to repurchase from you the instruments on which such default has occurred. for its outstanding balance, less unearned discount charges. 'The Company' will be kept continuously advised of all defaults or nonpayments on any notes or instruments purchased by you hereunder, or installments thereof, and its cooperation will be requested to obtain collection whenever you may deem convenient to seek such cooperation. Extensions of time granted, and/or compromises, settlements or agreements with any purchaser under such notes or instruments, will be made by you, only with the approval and consent of 'The Company' and after a physical check-up of the vehicle and a reinvestigation of the credit standing of the purchaser. A waiver of any right shall not operate as a subsequent waiver of such right, but all rights hereunder shall continue, notwithstanding one or more waivers. It is understood that this agreement constitutes our sole mutual understanding regarding the subject matter hereof, and that no provision hereof shall be modified or altered, except in writing, duly signed by one of your duly authorized officers.

" '4. If 'The Company' shall be required by the terms hereof and shall fail to repurchase any instrument upon default; or if 'The Company' shall fail to perform any of the other terms, covenants and conditions of this agreement; or if a petition shall be filed by or against 'The Company' under any of the provisions of the Bankruptcy Act or amendments thereto; or if a receiver shall be appointed for 'The Company' or any of the 'The Company's' property; or if in the event a judgment shall be recovered, a warrant of attachment or an injunction shall be issued against, or against any of the property of, 'The Company'; or if a meeting of the creditors of 'The Company' shall be called by 'The Company' for the purpose of considering any distressed or threatened distressed financial condition of 'The Company'; or if 'The Company' shall become insolvent, commit an act of bankruptcy, make an assignment for the benefit of creditors, appoint a committee of creditors or a liquidating agent, offer a composition or a general extension to its creditors, make a bulk sale or send notice of intended bulk sale; or if 'The Company' (being an individual) shall die, or (being a partnership or cor-

poration) shall be dissolved or cease to do business; then, and in any such event, 'The Company' shall forthwith repurchase all outstanding instruments purchased by you hereunder, and will pay you therefor a repurchase price equal to the amount unpaid and owing thereon, less unearned discount charge, and less any credit balance of 'The Company' in any general, special or reserve account with you, or at your option you may sell said instruments at public or private sale held on at least 10 days' written notice to 'The Company,' sent by ordinary mail to the last known address of 'The Company,' at which sale you may be a purchaser, and 'The Company' agrees to pay any deficiency remaining due to you, after crediting the net proceeds of such sale.

" '5(a) You will pay 'The Company' for any such instruments as are acceptable to you ninety-five per cent (95%) of the net sale value of the vehicle sold, less any down-payment and/or trade-in value of any vehicle accepted by 'The Company' on account, or such other percentage as may be mutually agreeable to us at the time of such acquisition. The remaining five per cent (5%), together with the 'Dealer's Bonus' of one and one-half per cent (1½%) of the amount financed on new or used automobiles or trucks in each retail contract, shall be credited to a book account maintained by you, hereinafter called the 'Reserve,' which account shall be collateral security to you for the payment of any and all obligations of 'The Company' to you, as herein set forth, and which shall not be assignable or in any other manner encumbered by 'The Company' without your prior written consent. If at the end of each three (3) months hereafter the credit to the 'Reserve' shall exceed ten per cent (10%) of the outstanding aggregate amount due or to become due under the instruments acquired by you hereunder, and 'The Company' shall not be in default under any agreement with you, then you agree to pay to 'The Company' out of the 'Reserve,' a sum which will reduce the 'Reserve' to ten per cent (10%) of the outstanding aggregate amount due or to become due under the instruments acquired by you hereunder.

" '5(b) If the purchaser under any instrument purchased by you hereunder shall be in default for a period of three (3) consecutive installments, or in the event of the breach of any one or more of the warranties set forth herein, 'The Company' will forthwith upon demand, repurchase from you any such

defaulted instrument or any instrument affected by such breach of warranty, together with any other instrument or instruments of such purchaser held by you hereunder, and 'The Company' will pay you therefor a repurchase price equal to the unpaid amount owing on such instrument, or instruments, less unearned discount charge, which instruments, upon such payment, shall be reassigned, and any note shall be redelivered by you, all without recourse to you. In lieu of such demand, you may charge the 'Reserve' with the unpaid amount due on any such instrument or instruments, less unearned discount charge. You may make any charge to the 'Reserve' without notice to 'The Company,' and whether or not you have made demand upon 'The Company' or the purchaser, or taken any other action under the instrument. All such payments or charges to the 'Reserve' shall include reimbursement to you for all disbursements incurred by you in connection with such instruments, including all legal fees, court expenses and costs, and reasonable attorney's fees.

" '6. This agreement shall remain in full force and effect unless written notice of termination shall have been received by either of us. The obligation of 'The Company' shall survive any such termination as to any instruments acquired by you prior to the effective date of such termination, and with respect to any extension or modification of any such instruments. This agreement shall be construed under the Laws of Puerto Rico. This agreement shall inure to and bind you and 'The Company' and our respective successors and/or assigns.'

"(15) At the same meeting of September 30, 1948, and at subsequent meetings there was discussed again in detail, with the active intervention of Efraím Soler, the details in connection with the manner in which the finance charges should be computed in view of certain doubts in the mind of the General Manager. There was also discussed, also with the active participation of Soler and of Mascaró, the details relative to the class of commercial documents which would be used by the dealer, whether chattel mortgages or conditional-sales contracts. There was also implemented that part of the finance plan adopted in connection with the insurance of vehicles, and a resolution was adopted whereby every purchaser of a vehicle would pay a certain amount of insurance for the benefit of the dealer vendor and of Financial Credit or the Bank, as the case might be; that the amount of premiums for such insurance would be charged to the pur-

chaser, in addition to the finance charges; that the distributor or dealer would pay directly to the insurance company the amount of the policy, in which case Financial Credit would reimburse to the distributor in each contract the amount of the premium payable, which premium would be included in the amount financed.

"(16) The parties agreed that certain contracts of conditional sales of vehicles which were admitted in evidence as Exhibits 39, 39A, 39B of the plaintiff were typical and served as an example of the manner in which the business of Soler & Mascaró operated in connection with that of the defendant. Let us examine Exhibit 39-A.

"On September 7, 1949, Soler & Mascaró and Miguel Otero Chaves subscribed a printed conditional sales contract whereby the latter purchased from the former a new De Soto automobile for the price of $2,861.74. The vendee delivered to the vendor as initial payment another vehicle valued at $1,396. The vendee bound himself to pay the difference of $1,465.74 to the vendor, or to its assigns, in the office of Financial Credit in Santurce, in 17 monthly installments of $80 each and one installment of $105.74, the first of which would become due on October 7, 1949 and the last one on March 7, 1951. The vendee also subscribed on the same date and delivered to the vendor a promissory note for the total amount of the debt, as evidence thereof. Among other covenants and conditions common to conditional sales, it was provided in the contract that in the event of delay in the payment of any such installments, default interest would accrue thereon at 9 per cent annually, as well as that, if the vendee should fail to pay promptly, on its due date, one of the installments, or if he should fail to comply with certain other obligations, he would be bound to pay, in addition to the full amount of the debt, the default interest thereon, and the expenses incurred in the collection of such installments an amount certain of $24 for attorney's fees for each installment involved.

"At the end of the contract there appears in print an assignment and transfer in which Soler & Mascaró, under the signature of Mariano Mascaró, stated on the same date of the contract that, for value received to its entire satisfaction, it assigned and transferred to Financial Credit Corporation, its heirs, assigns, or successors, the total amount of the previous conditional sales contract, and every right, action, cause of action, or interest which Soler & Mascaró might have thereunder in

the motor vehicle described therein, and in the promissory note which the vendee subscribed in favor of Soler & Mascaró jointly with the execution of the said contract. Financial Credit, its heirs, assigns, or successors were expressly authorized to exercise, in their own right and in behalf and representation of Soler & Mascaró, each and every judicial or extrajudicial action, or any remedy which Soler & Mascaró could have exercised personally had not this assignment been made. Soler & Mascaró bound itself jointly and solidarily in favor of Financial Credit, its heirs, assigns, or successors, as guarantors of the vendee in the performance of the payment by such vendee of the monthly installments specified in the contract object of assignment and the promissory note subscribed jointly with him as well as in the fulfilment of the other obligations, conditions and stipulations, terms and stipulations contained in the said contract. Lastly, it was stated that this assignment and transfer was made subject to the conditions, terms, and stipulations contained in the contract entitled 'Dealer's Retail Agreement' which had been subscribed prior to that date, by the undersigned with Financial Credit Corporation, all of which would be considered as an integral part of this assignment of rights.

"There appear in the record of this contract (Exhibit 39-A of the plaintiff), in addition to the original thereof, the following documents under the printed heading of Financial Credit: (a) application for credit signed by Otero Chaves and personal particulars; (b) letters to Financial Credit from a commercial firm and a bank on references of the vendee; (c) copies of a card showing the monthly installments paid by Otero Chaves; (d) letter of Financial Credit to Chaves of April 10, 1951, seeking collection of the final balance and certain accrued default interest up to that date; and (e) a printed form under the heading of Financial Credit entitled 'Work Sheet', dated September 12, 1949, prepared and signed by Soler & Mascaró under the signature of Mariano Mascaró. In this last document there appears the following liquidation made by Soler & Mascaró:

1.—Cash price including tax........................... $2,596
2.—Initial cash payment (valued of car traded in)...... 1,396
3.—Debit balance of the cash price.................... 1,200
4.—Insurance premiums ............................ 32.68*

(Other evidence showed that this insurance was $32.30 instead of $32.68, and that Soler & Mascaró charged a higher insurance premium than that fixed by the insurance companies.)

5.—Balance to be financed............................. 1,232.68
6.—Differential (finance charges) ...................... 233.06

7.—Balance payable in installments.................... 1,465.74
8.—Installments of 1 × $105.74 .
 17 × 80.00
9.—Total Selling price (2 plus 7)...................... $2,861.74

In this same document there appears an item inside a square entitled 'Distribution,' where the following is written in pencil: Distribution:

| | | |
|---|---|---|
| Total Notes | | $1,465.74 |
| Principal | $1,252.77 | |
| Difference | 212.97 | |
| | 1,465.74 | |
| Finance Charges | $194.18 | |
| Bonus | 18.79 | 212.97 |
| | | 1,252.77 |
| Reserve | | 62.64 |
| Net to the dealer (Ck No. 807) * | | 1,190.13 (Check No. 808.) |

"The defendant obtained the finance amounts which appear under the caption 'Distribution' as follows:

"To the debit balance of the cash price of $1,200 there was added the amount of the insurance premium issued for the sole benefit of Soler & Mascaró and of the defendant, as if it were part of the cost of the vehicle to the vendee, there remaining a debit balance to be financed of $1,232.68. Applying the finance rates shown on the chart and the operation contract approved, that is, 13½ per cent (9 per cent for one year, 4½ per cent for the remaining 6 months), plus 2 per cent of operation charges, plus 1½ per cent bonus for the dealer, making a total of 17 per cent, and dividing the total balance due of $1,465.74 among 117 (100 per cent of the principal plus the 17 per cent referred to for charges), the defendant obtained the principal of the contract aggregating $1,252.77.[2] (It should be noted that, since the vendee's debt is only $1,232.68, including insurance, the finance charges were computed on a principal greater than $1,252.77. On the basis of the actual debt, including the insurance from which the vendee did not derive any benefit, the finance charge should have been $209.55 which, added to the debt, would give a total of $1,442.23 and not $1,465.74. If the vendee would have

borrowed the difference of $1,200 for the purpose of buying the vehicle in cash, in order to pay off that sum in the same 18 months and in the same installments he would have paid some $85 interest at the maximum permissible rate, as compared with $233.06 which he had to pay.) It then computed 17 per cent on this principal of $1,252.77, or $212.97, which is the finance charge. It also computed the bonus to Soler & Mascaró of 1½ per cent of $1,252.77, or $18.79. It computed the reserve by multiplying the same principal of $1,252.77 by 5 per cent, or $62.64. The principal computed of $1,252.77 to be financed, plus the finance charge of $212.97, add up to the total deferred amount of $1,465.74 which the vendee was bound to pay in 18 installments.

"Out of the charge of $212.97 the defendant credited to Soler & Mascaró $18.79, which represents the bonus of 1½ per cent, and withheld for itself the difference of $194.18. It sent a check to Soler & Mascaró for $1,190.13 which, together with $62.64 which represents the 5 per cent withheld as reserve to be credited to it, total the principal of $1,252.77 of the contract to be financed.

"According to the foregoing, Soler & Mascaró received in all, since in this case the vendee tendered all the payments: (a) off-hand, $1,396 for the value of the automobile traded in, plus $1,190.13 from Financial Credit, or $2,586.13, which amount is only $9.87 less than the cash price of the vehicle; and (b) $81.43 credited in its favor as reserve for bonus, making a total of $2,667.56, as compared with the cash price of $2,596. Financial Credit received a gross profit of $194.18.

"(17) According to the sales report of the contract of Otero Chaves to which we have referred, Soler & Mascaró computed a total balance payable by the vendee of $1,465.74, thereby adding to the outstanding balance of $1,200 of the cash price, plus $32.68 of insurance, the amount of $233.06 of finance charges. Between the defendant and Soler & Mascaró the finance charges amounted to $212.97 only. This was due to the fact that, for the purposes of the vendee, Soler & Mascaró used finance charges greater than those furnished and used by Financial Credit. Had Soler & Mascaró used the rates of the defendant, the amount of $1,465.74 on which Financial Credit computed the principal of the contract would have been less; the principal of $1,252.77 which served as basis to Financial Credit for the financing would

have been lower; the finance charge of $212.97 would have been even less; and the total price in installments of the vehicle to the vendee would have been less. This practice of Soler & Mascaró of charging to the vendee finance rates higher than those used between it and the defendant created a situation more onerous to the purchaser of the vehicle and more beneficial to Soler & Mascaró, and, to a certain extent, also to the defendant.

"(18) During the period of the finance operations of conditional sales contracts which covered from approximately November 22, 1948 to approximately January 31, 1950, Financial Credit financed 891 contracts of Soler & Mascaró for a total value of $1,135,293.88. Of those 891 contracts Soler & Mascaró had to answer in part for some 71 of them up to an amount of $43,794.98, which was either paid or charged to its reserves. The remaining $1,091,498.90 in order to complete $1,135,293.88, was paid by the vendees of vehicles. The defendant received from the vendees, and in their default from Soler & Mascaró, the total value of the contracts amounting to $1,135,293.88.

"On the basis of the foregoing, Soler & Mascaró was compelled to pay in part approximately 8 per cent of the contracts financed with the defendant. The purchasers of vehicles paid to Financial Credit over 97 per cent of the total value of the contracts.

"(19) On the contracts financed for the amount of $1,135,293.88, the defendant paid offhand, in cash, to Soler & Mascaró, in periodical remittances between November 22, 1948 and January 31, 1950, the amount of $932,827.49. It also credited on its books the 5 per cent withheld as reserve, which amounted to $49,043.26. This credit, plus the previous remittance, amounts to $981,870.25, which represents the principal financed of the total amount of the contracts. The defendant also credited to it a bonus of 1½ per cent amounting to $14,749.71. Those periodical remittances were usually accompanied by a memorandum stating that they represented the purchase of a certain number of contracts, and there was enclosed a breakdown thereof showing the name of the vendee of the vehicle, the balance or price to be paid, the amount of the principal of each contract which was remitted in cash, the amount of 5 per cent of such principal withheld as reserve, the amount of the bonus of 1½ per cent in favor of Soler & Mascaró, and the amount corresponding to the defendant.

"In accordance with the finance plan and the contract, the amount that corresponded to Soler & Mascaró, counting the cash remittances and the credits in its favor on defendant's books, was $996,620.46 out of the value of $1,135,293.88, without taking into account at this time the final liquidation of its reserves. The difference of $138,673.42 corresponded to the defendant as profit from these transactions.

"(20) Unlike the system followed with the Banco Popular, Soler & Mascaró never signed, in connection with the financing of the said contracts, any obligation or note of its own in favor of the defendant for the amounts of the remittances which it received. It delivered to Financial Credit, by assignment and transfer, the original sales contracts and the personal notes of the vendees of the vehicles. As a matter of fact, Soler & Mascaró at no time reimbursed to Financial Credit, within the term or period, the amounts received from the latter in the form of the periodical remittances referred to.

"(21) The reserve of 5 per cent of the principal of each contract withheld by the defendant, as well as the bonus of 1½ per cent, did not constitute offhand cash money of Soler & Mascaró in possession of the defendant. Those reserves were offhand merely an entry on the books of the defendant in favor of Soler & Mascaró. As the vendee continued to pay the monthly installments to Financial Credit, or to Soler & Mascaró for Financial Credit, the reserves continued to represent in like proportion cash money of Soler & Mascaró in the hands of the defendant. Only when the purchaser paid the totality of the installments in 12, 15, or 18 months, did such reserves constitute money in their entirety. However, when those reserves exceeded 10 per cent of the total balance outstanding at a particular moment, Soler & Mascaró was entitled to receive such excess, even if at that moment the vendees had not paid all the installments due, provided it had met its obligations under the contract entered into by both.

"Prior to February 12, 1952, when the defendant, pursuant to an order of the United States Court for Puerto Rico, submitted to the Trustee, plaintiff herein, a final liquidation of its operations with Soler & Mascaró and of the reserve accounts, the defendant at no time delivered to Soler & Mascaró, in cash, part of those reserves, nor did Soler & Mascaró request such delivery. Particularly, it did not make such a request for

delivery on or about the months of March and June 1950. The Trustee requested those reserves from the defendant and the latter refused on the ground that Soler & Mascaró had failed to fulfill its obligations under the contract of November 17, 1948, the performance of which was secured by the reserves.

"(22) The cash money represented by the reserves in favor of Soler & Mascaró, in the hands of the defendant, was never set up in a separate fund or in trust. The finance contract subscribed by the parties contained no express provision on this point, and Soler & Mascaró at no time made demand to the defendant in this respect, nor objected to the fact that this money was commingled with the general funds of the defendant. Actually, there was a time when the bank deposits of the defendant were less than the reserves credited. In defendant's accounting the reserves were merely an account payable, which was part of its liabilities and which was secured by its entire assets. Soler & Mascaró received a monthly statement of the operations and accounts of the defendant, and from those monthly statements it did not appear that the reserve funds were segregated.

"(23) The defendant had established and in operation, independently of Soler & Mascaró, an integrated system for determining whether to grant or not credit to the purchasers of vehicles and for collecting the monthly cash installments, including office work and investigation personnel outside the office. As soon as it was offered a particular contract, the defendant would contact the conditional vendee giving him notice thereof and requesting information, and investigated his credit and other personal circumstances. After the contract was signed, the defendant again contacted the vendee, welcoming him as its customer and giving him a printed booklet of coupons to facilitate each payment as well as the instructions necessary to make the payments directly to it. When an installment fell due and was not paid, the defendant would send to the vendee a number of periodical notices demanding payment, and would send its agents to investigate the debtor and to determine the location and condition of the vehicle; and, lastly, it would make several demands through its attorneys and then bring proper legal action in court.

"Notwithstanding the foregoing, either at the customer's option or because of the advisability or relations of the business,

the work of collection and the disposal of vehicles surrendered or repossessed was usually done with the intervention and cooperation of the defendant as well as of Soler & Mascaró. Soler & Mascaró had its own collection department with personnel for such purpose, since, in addition to the contracts financed with the defendant, Soler & Mascaró was in charge of the collection of the portfolio in the hands of the Banco Popular and of the contracts in its possession.

"(24) On November 11, 1948, Soler & Mascaró was installed in its new premises in a five-story building located at Stop 11, Fernández Juncos Avenue, owned by Mariano Mascaró. Soler & Mascaró paid for these premises $2,500 monthly rent as compared with $500 which it paid for its old premises on Ponce de León Avenue, Stop 6½, Puerta de Tierra. The new premises had air conditioning and elevator paid by Soler & Mascaró. It was decorated, also on Soler & Mascaró's account, at a cost ranging between $12,000 and $15,000, and in addition to the $2,500 rent Soler & Mascaró paid the taxes on the building, the maintenance and conservation expenses, fire and public-liability insurance on the building as well as any other insurance and operation and maintenance expenses. The new premises called for an increase in personnel and equipment. There was established a repair shop which in the opinion of some directors was overly equipped with machinery which was not used at all, at a cost of approximately $40,000.

"In an auditing made by the firm Sparrow Waymouth & Co. of the business of Soler & Mascaró for the fiscal year from February 1, 1948 to January 31, 1949, it appears from a comparative study that the operation expenses of Soler & Mascaró represented 30 per cent of the gross income received between February 1 and September 30, 1948, during the time the corporation operated on its premises of Puerta de Tierra, and between October 1, 1948 and January 31, 1949, the said operation expenses represented 85 per cent of the gross income for that period, this notwithstanding the fact that during the latter four months' period the gross income was greater in proportion to the gross income for the previous eight months' period.

"(25) Already early in the year 1949, Soler & Mascaró was operating with difficulty despite its assets. The situation became worse from and after August and September during which time, in the opinion of its principal stockholder, the

situation was chaotic. In August 1949, Efraím Soler was removed from the management by the other directors and stockholders and substituted by Mariano Mascaró. Soler was accused of mismanagement and of having withdrawn funds for personal uses, although chargeable to his gains; of having incurred unusual excessive expenses of the corporation in relation to the income, which expenses, instead of producing more, had operated to diminish the profits. After his removal from the management, Soler became director of the sales department where he fixed the prices of the new vehicles and of those traded in and handled matters concerning credit to be granted. In this office he was also charged with failure to cooperate with the directors in the policy of economy and of drastic reduction of expenses introduced. At the time of ceasing in the management Soler had withdrawn some $30,000, and afterwards, as director of sales with a lower salary, he also demanded an open account in his favor on which he could withdraw for his personal use.

"In an auditing of the business of Soler & Mascaró made by the firm Sparrow Waymouth & Co., at the request of the Banco Popular, which covered the period from February 1 to September 30, 1948, that firm submitted a report containing several criticisms on the functioning of the corporation, among others, and apart from technical errors, the existence of an incorrect and carelessly managed accounting which did not permit the directors to acquaint themselves at regular intervals with the financial condition of the corporation, nor the condition of the balances deferred in its favor; late accounting of the accounts receivable which were not up to date, and which reflected excessive liberality in the granting of discounts to customers; a lenient and inadequate internal control of the company; the payment of a dividend without there being a substantial surplus, thereby creating as of September 30, 1948, a deficit of $13,773.32; an overdraft of $166,182.34 in the current account of the Banco Popular as of September 30; inadequate accounting and management of the current cash; the withdrawal of funds for the use of officers and employees; and other criticisms appearing on that report which was admitted in evidence. The money withdrawn by officers and employees amounted to $9,701.06 on September 30, 1948. At the end of the year ending January 31, 1949, that amount had increased to $31,522.10.

790

"(26) By October 1949, Soler & Mascaró had failed to pay some $80,000 of excise taxes on vehicles and also had a debt from income tax, thereby owing to the Treasurer a total amount of $126,139.26 on account of taxes. The then Treasurer of Puerto Rico pressed collection and an agreement was reached whereby a payment of $12,000 would be tendered immediately, the balance to be paid in one initial installment of $10,000 on November 5, 1949, and in succeeding monthly installments of not less than $5,000. Soler & Mascaró would open in the Banco Popular a special account in which would be deposited all the money accruing from the sale of parts and accessories and from the service department for the payment of such monthly installments, and a chattel mortgage would be constituted in favor of the Treasurer for the sum of $50,000 on the office furniture and equipment and machinery of the shops. In addition, the stockholders would pledge 2,000 common shares of the corporation.

"(27) By October 1949, Soler & Mascaró owed insurance totalling $18,010.34, which had been collected from the customers or received from the defendant and which had not been paid to the insurance company. An agreement was made whereby that sum would be paid in monthly installments. By December 30, 1949, two of those installments were due and an additional insurance debt of $4,810.27 had been incurred. By letter of this date the insurance company threatened to cancel the policies. By letter of the same company of March 10, 1950, notice was given to Soler & Mascaró as well as to owners of the vehicles of the definitive cancellation of the insurance, advising them to take up with Soler & Mascaró the reimbursement of the premiums on the insurance cancelled. By letter of the same company of March 16, 1950, it ratified to Soler & Mascaró that the insurance debt amounted to $19,189.04, and that a judicial proceeding for the collection of that amount would be brought against it and against Financial Credit as coinsurers of those policies.

"(28) The purchasers of vehicles whose insurance had been cancelled claimed from Soler & Mascaró, Financial Credit, and the Trustee, plaintiff herein, the part of the premium paid which had been cancelled, and, after some consideration of the matter, the defendant elected to refund to each purchaser, by way of a reduction in the last installment payable, the amount of the premiums cancelled totalling $5,217.74. The amount thus refunded

was later charged by the defendant to the reserve of Soler & Mascaró. When those reimbursements to the purchasers of the vehicles were made, Soler & Mascaró was already in bankruptcy.

"(29) In the course of its dealings with the defendant, Soler & Mascaró failed to comply with the obligations assumed under the finance agreement and incurred acts and omissions in violation of such agreement and of the mutual covenants thereunder. Among other things, Soler & Mascaró failed to pay installments which had not been paid by the vendees of vehicles; failed to recover from the defendant those contracts in which the default in payment occurred in three or more consecutive installments; it failed to recover the contracts in cases of repossession and to take charge of the vehicles repossessed or surrendered, paying to the defendant the outstanding balance of the debt. On a certain occasion, and in view of the action of Soler & Mascaró, the defendant placed some of its employees at the cashier's office of Soler & Mascaró so that they could supervise the collection and see that the money was remitted promptly to it, as well as to supervise the disposition of the vehicles repossessed which the defendant deposited with Soler & Mascaró. The defendant sent monthly statements of its operations to Soler & Mascaró showing the liquidation of the reserves of the latter, together with the expenses incurred in the proceedings for repossession or for the disposition of the vehicles repossessed or surrendered, and with the amount of the losses sustained in those cases in which the sale of the vehicle repossessed or surrendered did not cover the outstanding debt as well as expenses incurred.

"(30) At a meeting of the Board of Directors of Soler & Mascaró held on January 23, 1950, President Mascaró informed that the financial condition of the corporation was most critical, stating that it was due to the lack of cash to meet the numerous obligations of the corporation, to the failure to obtain from the Banco Popular credit for the importation of new vehicles and financing of the wholesale business; to the refusal of the Bank to liberate part of the marginal reserves; and to the inconveniences encountered with Financial Credit in the negotiation of clients' paper because of the difficulty in registering the contracts as a result of the provisions of the Public Service Commission and of the Department of Interior, particularly in the cases of public vehicles. At this meeting it was agreed to offer

the corporation for sale to an interested group for the sum of $160,000, if a higher price could not be obtained.

"(31) In view of the critical situation of Soler & Mascaró, the Banco Popular withdrew at this time the wholesale credit line to import vehicles and parts. As a result, at a meeting of directors held on February 14, 1950, it was agreed to discontinue the line of De Soto products before it was withdrawn. It was said that, in view of the loss of that line and since the corporation was left without any agencies, Soler & Mascaró should be liquidated. At a subsequent meeting of stockholders held on February 27, 1950, a final resolution was adopted for the purpose of resorting to the United States Court in a settlement proceeding under Chapter X of the Bankruptcy Act. The petition was filed in Court on March 28, 1950.

"(32) As a result of the discontinuance by Soler & Mascaró of the De Soto line, a special meeting of the Board of Directors of the defendant was held at which, the decision having been confirmed by Mascaró himself who also informed that he had decided on a liquidation of Soler & Mascaró, the defendant resolved to suspend immediately the financing of the contracts of the former.

"(33) At the time that it resorted to the United States Court in March, and later after being adjudicated bankrupt in July 1950, Soler & Mascaró had reserves in its favor for some $39,406.46 which had been withheld in the Banco Popular at the beginning of its operations. On February 28, 1950, it also had reserves credited in Financial Credit which were pending liquidation, amounting to $63,667.60, which represented $12,557.19 in excess of the 10 per cent of the standing total balance which on that date amounted to $511,104.12. By July 1, 1950, the reserves credited in Financial Credit pending liquidation amounted to $63,748.76, which represented $36,118.31 in excess of 10 per cent of the standing balance of $276,304.52. Neither of those entities delivered on those dates any part of these reserves.

"(34) During the critical period Mariano Mascaró attempted to raise funds for the corporation, but the stockholders refused to contribute any, although they were financially in a position to do so. Jaime Ramón, the principal stockholder, who had invested $82,500 in the corporation, was of the opinion that the problem was not one of contributing more money but one of strict economy and reduction of the expenses which were higher

than the income, and that under the present circumstances a contribution of $20,000 to $25,000 was useless and did not remedy the situation.

"(35) The Board of Directors of Soler & Mascaró met on June 27, 1950, and after an exposition by President Mascaró analyzing the failure of every attempt to continue operating because of lack of credit and of cash to defray the most urgent expenses such as salaries of the employees, since the income from the sale of parts had been applied to the Treasurer under the plan for the payment of taxes due, and the impossibility of acquiring new vehicles and the reduction in the sales, it was agreed that Soler & Mascaró should submit to bankruptcy. At his own request, it was adjudicated voluntary bankrupt on July 17, 1950.

"(36) As of the adjudication in bankruptcy, Financial Credit sent to the Trustee, plaintiff herein, a monthly statement of the transactions of Soler & Mascaró showing the amount of the reserves and the charges and credits made thereto. On February 12, 1952, a final liquidation, certified as correct by the firm Sparrow Waymouth, and checks in favor of the Trustee amounting to $27,812.44, were sent to the Trustee. Of this amount, $14,638.71 represented the final liquidation of the accounts of the reserves proper. There were also sent to the Trustee the contracts of Soler & Mascaró which were still pending, a statement of the vehicles repossessed and the place where they were on deposit, and a statement of the persons whose insurance had been cancelled and to whom the defendant credited in the last installment the total amount of $5,217.74.

"As of March 31, 1950, the portfolio of Soler & Mascaró in Financial Credit amounted to $443,152.03. After steps for collection were taken by the defendant that portfolio was reduced to $10,836.18 as of February 12, 1952, the date of the final liquidation.

"(37) On January 31, 1948, Soler & Mascaró reported a profit of $39,040.05 for the period of operations after making allowance for income tax, out of which profit $38,700 was capitalized as dividends in the form of shares.

"On the basis of the profit of $77,596.80 reported as of July 30, 1948, the capital was increased by $75,000 by capitalizing the same and the remainder was distributed. During the whole year from February 1, 1948 to January 31, 1949, Soler & Mas-

caró realized a profit of $77,943.56 according to the auditing of the firm Sparrow Waymouth.

"(38) Financial Credit realized a profit of $46,742.33 since its incorporation and up to September 30, 1949, after making allowance for income tax, and as of September 30, 1950 of $70,095.28 after allowance for tax, according to the auditing of Sparrow Waymouth & Co. During the period from October 1948 to September 30, 1949, Financial Credit realized a gross income of $110,981.20 from finance charges. From October to September 30, 1950, that profit was $179,692.94.

"(39) The Court finds that the contract entitled in English "Dealer's Retail Agreement,' signed on November 17, 1948 between Soler & Mascaró and the defendant Financial Credit was not, as a matter of fact and apart from the juridical effect which it might be ruled to have, a simulated contract, nor was it made against the will of Soler & Mascaró, nor under misrepresentation, duress, or pressure of the defendant, nor through ignorance or lack of knowledge of Soler & Mascaró of its terms, obligations, and covenants, and of the terms and clauses of the finance-operation plan of the defendant which served as a basis to the said contract. Nor was it proposed, prepared, and drafted by the defendant as a result of the application for a loan made to it by Soler & Mascaró.

"The Court finds that, upon signing the contract of November 17, 1948, the contracting parties had, as a matter of fact, the intention and purpose of carrying out the transactions described in that contract and no others, regardless of the juridical effect of those transactions, and of complying mutually with the rights and obligations set forth in the said contract, it not having been the intention of Soler & Mascaró to carry out transactions other than those described on the face thereof. In fact, the Court finds that all the operations transacted between Soler & Mascaró and the defendant under the contract of November 17, 1948, independently of the juridical interpretation of the contract or of its clauses, were, as a matter of fact, of the class and of the nature therein agreed upon and did not depart from them.

"The installment business of Soler & Mascaró required that a substantial working capital be available. Upon the refusal of the Banco Popular to finance this working capital and the refusal of other banks to offer. it, Soler & Mascaró organized

the defendant corporation with well-known reputed businessmen, professionals, and capitalists for the main purpose of serving as instrument or auxiliary branch in this aspect of its business, notwithstanding the fact that the defendant afterwards carried out transactions with other persons and entities. Through the defendant, Soler & Mascaró obtained indirectly from the banks, after losing it directly, the financing of its business, since, notwithstanding the capital of the defendant, the latter in turn financed its operations with money borrowed from the bank.

"The financial operation of the defendant, so that it could serve as the useful instrument for which Soler & Mascaró organized it, was also to a great extent the creature of Soler & Mascaró. The amounts under the name of finance charges which the vendee of a vehicle was bound to pay as surcharge in excess of the outstanding balance were the result of the mutual action of Soler & Mascaró and the defendant. By this mutual action that surcharge was imposed on the vendee as part of a price for a period certain, at the will of the vendor and without any intervention on the part of the vendee other than to refuse to purchase the vehicle. Soler & Mascaró and the defendant would then distribute the surcharge subject to a certain formula established in the finance plan which was adopted for the defendant in the contract of November 17, 1948, which was signed by defendant and Soler & Mascaró. This plan and this contract, their purposes and scope, were known to Soler & Mascaró from the time they were designed.

"(40) The Court finds, as a matter of fact, that the defendant had commingled with its funds the money which represented the reserves credited to Soler & Mascaró. In the absence of segregation, it must be concluded that the defendant used that money in its transactions. Those reserves were not set up or deposited by Soler & Mascaró at the request of the defendant, but were part of the agreements and covenants embodied in the contract of November 17, 1948. As a matter of fact, the defendant charged to those reserves and deducted therefrom amounts and interest thereon which the conditional vendees had defaulted; expenses and disbursements incurred in steps for collection, including expenses incurred in repossession proceedings and in the conservation, storage, maintenance, and repair of vehicles repossessed or surrendered; as well as the losses sustained in those cases in which the sale of the vehicle repos-

sessed or surrendered did not cover the debt and the disbursements.

"As a matter of fact, Financial Credit executed conditional sales contracts of Soler & Mascaró, repossessed vehicles and sold them, and charged to Soler & Mascaró expenses and losses. Those repossessions and sales were made without objection or opposition by Soler & Mascaró, usually with its knowledge or intervention. The expenses incurred as well as the losses liquidated were reported by the defendant to Soler & Mascaró and, after the bankruptcy, to the Trustee.

"(41) The Court concludes, in view of the facts proved, that defendant Financial Credit did not bring about, or cause, or finally precipitate the financial collapse and bankruptcy of Soler & Mascaró.

"Even though we were to conclude, as a matter of law, that certain acts attributed to the defendant by the plaintiff Trustee were illegal or unauthorized, the bankruptcy or collapse of 'Soler & Mascaró' could have been the result of a series of interweaved acts, circumstances, and factors which were present at the same time. Among other causes, are that of insufficient capitalization from the inception; a highly accelerated development of the business as compared with the available capital; erroneous acts and norms of the proper corporation in the internal government and management of its business; its policy of expenses; the sudden increase in its operating expenses as a result of the installation in the De Soto building; the enormous tax debt which had accumulated, which compelled it to set aside part of its current income to pay it off; the loss of the bank credit for its retail business and later for its importation business; the loss of its agency or representation as a result of the loss of its wholesale credit; and many other acts and factors which appear from the evidence admitted.

"(42) Juan Enrique Géigel, stockholder and officer of Financial Credit, at no time received compensation from Soler & Mascaró for his services as supervisor and representative of the defendant in the business of Soler & Mascaró. Géigel, Esq. had rendered and was rendering professional services to Soler & Mascaró since its incorporation, prior to the organization of the defendant corporation."